# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff**

**-vs-**                  **Case No. 2:12-cr-7-FtM-29DNF**

**ROBERT RUSSELL MATCOVICH,**

      **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

  This cause is before the Court on the Defendant, Robert Russell Matcovich's Motion to Suppress Statements (Doc. 22) filed on March 27, 2012. The Defendant is requesting that the Court suppress statements made on January 19, 2012 at 423 Avalon Drive, Cape Coral, Florida. On April 9, 2012, the Government filed a Response to Defendant's Motion to Suppress Statements (Doc. 25). The Defendant is charged in an Indictment (Doc. 12) with knowingly distributing a visual depiction in interstate or foreign commerce and the production of such visual depiction involving the use of a minor engaging in sexually explicit conduct in violation of 18 U.S.C. §§2252(a)(2) and (b)(1), and with possessing a visual depiction that had been transported in interstate or foreign commerce where the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct in violation of 18 U.S.C. §§2252(a)(4)(B) and 2252(b)(2). An evidentiary hearing was held on April 12, 2012.

## I. Evidence

The Government presented the testimony of the following officers: Federal Bureau of Investigation ("FBI") Special Agent Christopher Brannan, FBI Special Agent Brent Cox, and Homeland Security Special Agent J. Keith Cramsey. The Government introduced into evidence Government Exhibit 1, a photograph signed and dated by the Defendant[1], and Government Exhibit 2, a Composite list of search terms. The Defendant presented the testimony of Elena Saylor, Stephanie Almasi, and David Jackson. The Defendant introduced into evidence Defendant Exhibit B, a diagram of 423 Avalon Drive.

### A. Special Agent Christopher Brannan

SA Brannan testified that he participated in executing a search warrant at 423 Avalon Drive in Cape Coral, Florida on January 19, 2012. (Tr.[2] p. 4). SA Brannan's duties include investigating violent crimes, theft, white collar crimes, and participating in the innocent Images Task Force. (Tr. p. 4). His role was to enter the residence, secure the individuals in the residence, and then assist the search team in collecting evidence. (Tr. p. 5). He arrived at the residence at approximately 6:30 a.m. with a number of other officers. (Tr. p. 5). The officers announced their presence and the search warrant, knocked on the door but no one answered, and determined that the door to the residence was open. (Tr. p. 5). The officers entered the residence, and he and another officer, Special Agent Ryan Davis went to the bedroom to the right of the door. (Tr. p. 5-6). Two individuals, later identified as

---

[1] The Court inquired of Assistant United States Attorney Tama Calderone if the photograph was contraband, and Ms. Calderone confirmed that it was. The witness, SA Cramsey and the Court viewed the photograph and then returned it to Ms. Calderone. (Tr. p. 66).

[2] "Tr." refers to the Transcript (Doc. 34). of the evidentiary hearing held on April 12, 2012.

Stephanie Almasi and David Jackson were in the bedroom. (Tr. p. 6). They were ordered to lie on the ground, and were handcuffed for the safety of the officers. (Tr. p. 6). SA Brannan informed them that they were not under arrest. (Tr. p. 6). After clearing the bathroom and another bedroom, the officers took Almasi and Jackson to the living room. (Tr. p. 6). Other officers in the residence also brought the other people in the house to the living room. (Tr. p. 6). After the officers were notified that the residence was clear, the residents were placed in chairs around the living room. (Tr. p. 7). Officer Patricia Enterline explained the purpose of why the officers were in the residence and that they were executing a search warrant. (Tr. p. 7). The handcuffs were removed from the residents. (Tr. p.8). Officer Enterline told all of the residents that if they wanted to stay, they could not impede the search, and if they wanted to leave, they were free to leave. (Tr. p. 7, 9). Some of the residents were escorted to their rooms to get dressed, and Jackson and Almasi left the residence. (Tr. p. 8). SA Brannan estimated that Almasi and Jackson were handcuffed for approximately 5 minutes. (Tr. p. 8).

On cross-examination, SA Brannan testified that there were approximately eight officers in the residence, and all were dressed in ballistic vests and raid gear. (Tr. p. 11-12). The officers had badges and firearms. (Tr. p. 12-13). There were officers stationed on the perimeter of the property, and there were boats at the dock. (Tr. p. 14). Forensic officers entered the residence as well to take photographs. (Tr. p. 15). Officer Enterline announced the search warrant and after that time, any resident who wanted to leave could gather their things with a police escort to prevent the residents from having access to any potential evidence, and then the residents could leave. (Tr. p. 17). SA Brannan remembers Officer Enterline stating that no one was under arrest and whoever wanted to leave could leave. (Tr. p. 19). Mr. Jackson and Ms. Almasi could have asked to leave in addition to being told they were able to leave. (Tr. p. 20). The officers had no specific subject or target for the

warrant only an IP (Internet Protocol) address for that location. (Tr. p. 22). The search warrant was executed to collect evidence. (Tr. p. 22).

### B. Special Agent Brent Cox

SA Cox is on the Innocent Images Task Force and part of his duties are to investigate crimes against children. (Tr. p. 28). On January 19, 2012, at approximately 6:00 a.m. he executed a search warrant at Avalon Drive, Cape Coral, Florida. (Tr. p. 28-29). He was there to investigate the trading of child pornography via a computer and the internet. (Tr. p. 29). He was the supervisor for the search warrant, and he was also there to conduct interviews of the residents. (Tr. p. 29). SA Cox went to the front door of the residence, knocked, and announced that he was with the FBI, had a federal search warrant, and that he was with other officers. (Tr. p. 30). No one inside the residence responded, and the front door was unlocked. (Tr. p. 30). The officers entered the residence, and there was a woman present, later identified as Elena Saylor. (Tr. p. 30). She was told to put her hands behind her back, and was secured by handcuffs. (Tr. p. 30). SA Cox proceeded to a bedroom where a Mr. Saylor and his young son were present. (Tr. p. 31). SA Cox became aware of a man, later identified as the Defendant Robert Russell Matcovich in the loft area of the residence. (Tr. p 31). SA Cox took the elevator to the second floor and told the Defendant that he was an FBI agent. (Tr. p. 31- 32). SA Cox was alone in the loft with the Defendant, so SA Cox told the Defendant that he was going to handcuff him for officer's safety. (Tr. p. 32). SA Cox told the Defendant he was not under arrest. (Tr. p. 32). SA Cox smelled marijuana in the loft area. (Tr. p. 32). SA Cox took the Defendant to the living room on the first floor and uncuffed him. (Tr. p. 32). In the living room, the occupants of the residence and occupants of the boats tied to the docks were gathered. (Tr. p. 33). The search warrant was read, and

SA Cox reiterated to all of the residents, including the Defendant that no one was under arrest, and if they wanted to leave, they could leave, and that the officers' focus was the search warrant. (Tr. p. 33, 35, 36). All the residents were uncuffed when he made his statements that they were not under arrest and were free to leave. (Tr. p. 33). The officers broke into groups and began searching the residence and began to interview the occupants. (Tr. p. 33). SA Cox interviewed Mr. Saylor. (Tr. p. 33). SA Cox saw two couples that were residents leave and remembers because he had a conversation about restaurants in the area with a couple. (Tr. p. 34). The search warrant was left at the residence, and the subscriber of the IP address was Mr. Saylor. (Tr. p. 36).

On cross-examination, SA Cox testified that he was the first person to enter the residence and approximately seven officers followed him. (Tr. p. 37). He recalled that Mrs. Saylor was handcuffed, a couple from Indiana were handcuffed, but he was not sure if Mr. Saylor was handcuffed. (Tr. p. 37). The Indiana couple were eliminated as suspects because they did not reside in the residence at the time the download occurred. (Tr. p. 39). SA Cox took the elevator to the second floor, handcuffed the Defendant, and took him to the living room. (Tr. p. 40).

On re-direct, SA Cox later testified that he also saw Mrs. Saylor leave to take her young son to school. (Tr. p. 44). Mrs. Saylor later returned to the residence. (Tr. p. 44).

### C. Special Agent Keith Cramsey

SA Cramsey specializes in transnational crimes including child pornography. (Tr. p. 45). On January 19, 2012, he assisted in executing a search warrant at 423 Avalon Drive. (Tr. p. 46). He was briefed by an FBI agent, and he and another agent were tasked with securing the perimeter and then conducting interviews of the residents. (Tr. p. 46). He knew this investigation involved peer to peer

sharing, but he did not know the name of the target only a Comcast IP address, and that the Comcast account was billed to Mr. Saylor at that residence. (Tr. p. 47-48). Prior to executing the search warrant, SA Cramsey knew the names of the owners, the Saylors, and knew that they were renting space to others in the residence and renting space for boats. (Tr. p. 47-48). SA Cramsey stayed at the perimeter of the residence until he was told that the residence was secured. (Tr. p. 48). He entered the residence and found eight individuals seated in the living room or great room of the house. (Tr. p. 49). None of the individuals were handcuffed. (Tr. p. 49). He recognized the Saylors and the Defendant from their driver's license pictures. (Tr. p. 49). When he entered, Agent Enterline was reading the search warrant, and describing what would occur that day including that the FBI team would conduct a search and she told the occupants that they were free to leave or stay, but they were not permitted to interfere with the search. (Tr. p. 50). SA Cramsey saw that the Defendant was present in the living room during Officer Enterline's announcements. (Tr. p. 50).

SA Cramsey introduced himself to the Defendant, told the Defendant that the reason he was there was to interview the Defendant, and asked the Defendant if he was willing to be interviewed. (Tr. p. 50). The Defendant immediately agreed to be interviewed. (Tr. p. 50). SA Cramsey asked the Defendant if they could go into a bedroom and sit down, and they proceeded into a bedroom. (Tr. p. 50-51). The first statement SA Cramsey made was to tell the Defendant he was free to leave, and the Defendant did not ask to leave. (Tr. p. 51). SA Cramsey told the Defendant he was not under arrest, was free to leave, could begin to answer questions and then stop, could answer only the questions he wished, and that he could leave at any time. (Tr. p. 51). The Defendant was very calm and cooperative, never asking to terminate the interview. (Tr. p. 51). They began their conversation with getting some background on the Defendant such as his age, date of birth, social security number, and

how long the Defendant had resided at the residence. (Tr. p. 51-52). The Defendant admitted to smoking marijuana daily and to using the internet daily. (Tr. p. 52). The Defendant was quite proficient with computers and the internet. (Tr. p. 52). The Defendant explained his experience with computers and that he fixed computers for his friends. (Tr. p. 54). They discussed the living arrangements in the residence, and that this case involved wireless peer to peer sharing and that the agents did not know who was responsible for certain downloads in the residence. (Tr. p. 52-53). SA Cramsey knew that a search was being conducted while their interview was taking place. (Tr. p. 53). The Defendant admitted that he had two computers in his loft plus his phone had internet capabilities. (Tr. p. 55). He was the person who set up the wireless network in the residence. (Tr. p. 55). SA Cramsey knew that the downloaded materials occurred on December 12, 2011 and December 13, 2011, and he asked the Defendant who had been residing at the residence on those dates. (Tr. p. 56). SA Cramsey learned that only the Saylors and the Defendant had been living at the residence during the time of the downloads. (Tr. p. 57). The other residents arrived after those dates. (Tr. p. 57).

The Defendant admitted that his hobbies included graphic design, using Photoshop, and viewing pornography on the computer, both adult and child pornography. (Tr. p. 54, 58-59). The Defendant openly discussed his "addiction" to child pornography as viewing photographs at least one time a month, using file sharing software, and then deleting the photographs. (Tr. p. 59, 60). The Defendant knew how to download these images. (Tr. p. 60). The Defendant told SA Cramsey that over the last ten years, he had seen thousands of images of child pornography. (Tr. p. 61).

The interview began at approximately 7:30 a.m. and ended at approximately 10:30 a.m. (Tr. p. 62). SA Cramsey and the Defendant did not remain in the bedroom the whole time. At one point after approximately 45 minutes, the Defendant wanted to smoke a cigarette. (Tr. p. 62-63). After

about an hour of being outside, and due to the cold weather, SA Cramsey and the Defendant returned to the bedroom to finish the interview. (Tr. p. 63). SA Cramsey confirmed that the Defendant was not under the influence of any illegal drugs because SA Cramsey knew the Defendant used marijuana. (Tr. p. 63). SA Cramsey offered the Defendant the opportunity to make coffee, but the Defendant declined. (Tr. p. 72).

SA Cramsey asked the Defendant for websites for child pornography, and the Defendant provided his peer to peer sites. (Tr. p. 63). An officer brought in three photographs of child pornography. (Tr. p. 64). SA Cramsey asked the Defendant if he had seen these photographs, and the Defendant said no to two of the photographs and confirmed the he had seen one of the photographs. (Tr. p. 64). SA Cramsey asked the Defendant if he were willing to initial that image indicating that the Defendant had possessed and viewed it on his computer, which the Defendant agreed to do. (See, Gov. Exh. 1, Tr. p. 64-65). SA Cramsey also showed the Defendant a list of Limewire history with search terms. (See, Gov. Exh. 2, Tr. p. 66-67). The Defendant did recognize the search terms that he used to obtain child pornography. (Tr. p. 68). The Defendant stated that he liked photographs of girls and did not prefer the photographs depicting bondage and torture, and became nervous when that question was asked. (Tr. p. 69). The Defendant would download an entire batch of photographs, he did not just download certain ones from the batch, and then when he was finished viewing them, he would delete them. (Tr. p. 69).

SA Cramsey was concerned with there being a young boy in the house, and the Defendant indicated that he was dating a women with a nine year old daughter. (Tr. p. 70). The Defendant assured SA Cramsey that the child pornography was a fantasy world and he never touched a real child. (Tr. p. 70). SA Cramsey asked the Defendant if he would be willing to take a polygraph test, and the

Defendant agreed. (Tr. p. 71). The interview concluded, and the Defendant voluntarily left the residence with the FBI polygrapher. (Tr. p. 71). The Defendant later declined to take a polygraph. (Tr. p. 71).

If the Defendant did not wish to speak to SA Cramsey, the Defendant was free to leave the house. (Tr. p. 96). In his report, SA Cramsey wrote that the Defendant only had to answer questions if he wished, was not under arrest, and could stop the interview at any time. (Tr. p. 96). SA Cramsey never formally arrested the Defendant. (Tr. p. 97).

On cross-examination, SA Cramsey testified that the interview with the Defendant started at approximately 7:30 a.m, about an hour after the agents entered the residence. (Tr. p. 72-73). SA Cramsey discovered at the briefing before the search warrant was executed, that Officer Enterline had assigned him the task of interviewing Matcovich. (Tr. p. 73). SA Cramsey and Special Agent Yvette Camargo of Immigration and Customs Enforcement went to talk to the Defendant and both agents went into the bedroom with the Defendant. (Tr. p. 73-74). SA Camargo accompanied SA Cramsey the entire time of the interview. (Tr. p. 74). SA Cramsey asked the Defendant if he wanted to talk and they went to a bedroom for the interview. (Tr. p. 76).

SA Cramsey, SA Camargo and the Defendant left the bedroom after approximately 45 minutes and went to the patio so that the Defendant could smoke. (Tr. p. 82-83). When the Defendant asked to get his cigarettes, officers were searching the loft where the cigarettes were located, so SA Cramsey asked an officer to obtain the cigarettes. (Tr. p. 83). SA Cramsey testified that it was for the safety of the officers and for the safety of the Defendant that the Defendant was not given permission to get his own cigarettes. (Tr. p. 83). When the Defendant asked to use the restroom, SA Cramsey would require the Defendant to leave the bathroom door cracked open a bit. (Tr. p. 86). He required the door

to be cracked open for his own safety and for the safety of the Defendant. (Tr. p. 86-87). The Defendant never asked SA Cramsey to take a dog for a walk, because if the Defendant had asked, SA Cramsey would have permitted it because the Defendant was not in custody. (Tr. p. 88). SA Cramsey never read the Defendant his *Miranda*[3] rights. (Tr. p. 89). SA Cramsey made it clear to the Defendant that the interview was noncustodial, and the Defendant was free to leave. (Tr. p. 89). The Defendant was not told that he could remain silent, anything he said could be used against him, or that he had a right to an attorney. (Tr. p. 89-90).

SA Cramsey did prepare a report that was dated January 25, 2012, and in that report, SA Cramsey does not mention that he told the Defendant he was free to leave but did state that he told the Defendant he was not under arrest and could answer questions only if he wished. (Tr. p. 90-91). SA Cramsey did tell the Defendant he was not under arrest, and did not arrest the Defendant. (Tr. p. 93). The Defendant was arrested later that day. (Tr. p. 94). During the entire time of the interview, the Defendant was free to leave. (Tr. p. 94). The Defendant was not in custody during the interview, but he never left the residence during the interview. (Tr. p. 95).

### D. Elena Saylor

Ms. Saylor lives at 423 Avalon Drive with her husband and young son. (Tr. p. 99). They have tenants as well. (Tr. p. 99). They advertise on Craig's list to obtain tenants. (Tr. p. 100). On January 19, 2012, she heard a noise on the porch and saw police officers entering the home. (Tr. p. 100). The officers had flashlights and guns. (Tr. p. 101). One officer grabbed her, handcuffed her, and told her to stay in the living room. (Tr. p. 101). Her husband and son were in the bedroom. (Tr. p. 101). After all the occupants were handcuffed, they moved all of the people in the house to the main living room.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

(Tr. p. 101). She was handcuffed for approximately ten minutes. (Tr. p. 101). The Defendant was in the living room with her. (Tr. p. 102). There were many officers in the house. (Tr. p. 102).

After being uncuffed, one officer took her to the garage and asked her questions. (Tr. p. 103). Ms. Saylor testified that before she went to the garage she did not remember being told that she could leave, but after the questioning she knew she could leave and she took her son to preschool. (Tr. p. 104).

On cross-examination, Ms. Saylor testified that when she was handcuffed, she was told that she was not under arrest and that the officers were there to execute a search warrant. (Tr. p. 105-106, 107). She was also told that the officers did not know who the target was. (Tr. p. 106). The officers asked for her name and identifying information. (Tr. p. 107). No one told her that she had to remain at the residence. (Tr. p. 107).

**E. Stephanie Almasi**

Ms. Almasi testified that she and her boyfriend David Jackson were renting a room from the Saylors. (Tr. p. 110). She lives in Maine, and found the room to rent on Craig's list. (Tr. p. 110-111). On January 19, 2012, very early in the morning, she heard a knock on the outside door, and her dog began to bark. (Tr. p. 111-112). Her boyfriend opened the bedroom door and three or four officers dressed in black with guns told them to get on the ground, put their hands behind their back, and then they were handcuffed. (Tr. p. 112). They stayed on the ground for a while then someone helped her to her feet and they were taken to chairs in the living room. (Tr. p. 113). They were uncuffed and were told there was a search warrant for child pornography. (Tr. p. 113, 114). She does not remember being told she was free to leave. (Tr. p. 114). She and her boyfriend were taken outside on the deck and

asked how long they had resided at the residence, where they were from, what they were doing here, if the officers could have their computer, and other general questions about their background. (Tr. p. 115). Ms. Almasi was told that the officers were searching the house and that it was a good time for her and her boyfriend to leave. (Tr. p. 115). Ms. Almasi felt free to leave even before they told her that she was free to leave because she knew that the search did not involve her or her boyfriend. (Tr. p. 116).

On cross-examination, Ms. Almasi testified that she did not remember being told she was not under arrest, but was told that the handcuffs would be taken off. (Tr. p. 117). When she went into the living room, she remembers being told that no one was under arrest, and that after giving identifying information she was told that she was free to leave. (Tr. p. 118). Her cell phone and laptop were taken and searched. (Tr. p. 119-120). She and her boyfriend left the residence and went to breakfast. (Tr. p. 120).

Ms. Almasi clarified her testimony, that she heard a knock on the outside door of the residence, and then her boyfriend opened the door to their bedroom. (Tr. p. 121-122). The officers told Ms. Almasi and Mr. Jackson to get to the ground, and then they were handcuffed. (Tr. p. 122). After a period of time, they were taken into another room. (Tr. p. 122). They were handcuffed for a total of ten to fifteen minutes. (Tr. p. 122). She remembers that an agent told here what was happening. (Tr. p. 123).

### F. David Jackson

Mr. Jackson is from Maine, and on January 19, 2012 he resided at 423 Avalon Drive with Ms. Almasi. (Tr. p. 123-124). Around 5:00 to 5:30 a.m. on January 19, 2012, Ms. Almasi woke him up saying that there are people around the house with flashlights. (Tr. p. 124). He got up and the officers

came into the bedroom, he was put on the ground, and handcuffed behind his back. (Tr. p. 125). He was taken into a meeting room, and after a few minutes the officers explained what was happening. (Tr. p. 125). He was uncuffed. (Tr. p. 125). The residents were separated into different groups. (Tr. p. 125). He was asked a few questions, and then he asked if he could get some clothes and then leave. (Tr. p. 125). He was told, yes he could leave. (Tr. p. 125). He was escorted by officers to get clothes, he left his computers and cameras, and he and Ms. Almasi left the residence. (Tr. p.125). He did not remember whether or not he was told he could leave the residence before answering identifying questions. (Tr. p. 126).

On cross-examination, Mr. Jackson testified that when he was handcuffed, he was told that he was not under arrest[4] and that the handcuffs were for the officers' safety. (Tr. p. 128). He was taken to the main room in the house, uncuffed, and explained what has happening. (Tr. p. 129). He was told that the officers had to review all cell phones, computers, and cameras. (Tr. p. 129). Mr. Jackson was told that the officers did not know who the suspect was, just that the officers had a search warrant for the residence. (Tr. p. 130). The residents were broken into groups and asked identifying questions and information about their electronics, and at that point Mr. Jackson asked if he and Ms. Almasi could leave. (Tr. p. 130). It was clear to Mr. Jackson that he was not under arrest, was not detained, and was not being taken into police custody. (Tr. p. 131).[5]

---

[4] Mr. Jackson also testified that the officers did not say he was arrested, they just handcuffed him. (Tr. p. 129).

[5] Mr. Jackson testified that he had never received his cameras from the officers after the execution of the search warrant. (Tr. p. 132). AUSA Calderone directed Mr. Jackson to contact the agent at the hearing for the return of his property. (Tr. p. 133).

## II. Analysis

The Defendant asserts that the statements he made on January 19, 2012 were obtained in violation of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and the Fifth Amendment to the United States Constitution. The Defendant asserts that the officers conducted a custodial interrogation at the residence without giving him his *Miranda* rights. The Government asserts that the Defendant was not in custody during the interview that occurred during the execution of the search warrant on January 19, 2012, and that the statements made by the Defendant should not be suppressed.

The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. A court must exclude from evidence any incriminating statements made by an individual if, prior to making the statement, the individual was not warned of his right to remain silent and the right to obtain counsel. *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010), *Miranda v. Arizona*, 384 U.S. 436 (1966). These rights attach, however, only if an individual is in custody at the time the statements were made and subject to an interrogation by officers. *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2401 (2011). In the instant case, the Government did not argue that a police interrogation did not occur, therefore, the Court will consider only the first prong, whether the Defendant was in custody at the time he made incriminating statements.

Any police interview or interrogation of a suspect has "'coercive aspects to it.'" *J.D.B.*, 131 S.Ct. 2401 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curium*)). Interviews conducted while a suspect is in police custody have a heightened risk that the statements made were coerced. *Id*. (citing *Dickerson v. United States*, 530 U.S. 428, 435 (2000)). Because the "inherently

coercive nature of custodial interrogation 'blurs the line between voluntary and involuntary statements,' [citation omitted], [the Supreme Court] adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination." *Id*. Prior to questioning an individual in custody, officers must inform the individual of his right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to have counsel present. *Id*. (citing *Miranda v. Arizona*, 384 U.S. at 444).

A suspect is considered to be in custody for the purposes of *Miranda* when there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted). Courts must look to the totality of the circumstances surrounding the interrogation or interview to determine whether "'a reasonable man in [the suspect's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (quotation marks and alterations omitted). Some factors to consider include the location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of the questioning. *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012) (citations omitted). The test to determine custody is an objective one, the actual or subjective beliefs of the defendant and the interviewing officer on the issue of whether the defendant is free to leave are "irrelevant." *United States v. Brown,* 441 F.3d at 1347 (citing *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *Id*. (citing *United States v. Moya*, 74 F.3d at 1119) (quotation marks omitted, emphasis added). A court must conduct two distinct

inquiries, first the court must consider the circumstances surrounding the interrogation, and second given those circumstances, would a reasonable person feel that he was at liberty to terminate the interview and leave the scene. *J.D.B. v. North Carolina*, 131 S.Ct. at 2402, *United States v. Gomes*, 279 Fed. App'x. 861, 868 (11th Cir. 2008) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

In the instant case, the officers entered the residence at approximately 6:30 a.m. and gathered all of the residents together. The officers handcuffed the Defendant in his room, and brought him to the first floor to the living room where the other residents were also handcuffed. SA Cox testified that he told the Defendant that he was not under arrest. Weighing in favor of custody at that moment is the police-dominated atmosphere of the early morning initial entrance into the residence, the restraint of the Defendant, and lack of freedom of movement of the residents. However, shortly thereafter, the search warrant was announced, the handcuffs were removed, and the residents were told that they were not under arrest. There is conflicting testimony as to whether Officer Enterline told the entire group gathered in the living room that they were free to leave

SA Cramsey then introduced himself to the Defendant and asked the Defendant if he was willing to be interviewed to which the Defendant agreed. The testimony is uncontested that prior to the interview beginning, SA Cramsey told the Defendant he was free to leave. SA Cramsey asked the Defendant if they could go into a bedroom and sit down for the interview and the Defendant agreed. The testimony is uncontested that SA Cramsey told the Defendant he was not under arrest, was free to leave, could begin to answer questions and then stop, and could answer only the questions he wished. When a defendant is unambiguously told he is free to leave and is not in custody, then generally, courts reach the conclusion that the defendant was not in custody during an interrogation. *United States v. Gomes*, 279 Fed. App'x. 861, 868 (11th Cir. 2008) (citing *Brown*, 441 F.3d at 1347).

The Defendant was interviewed in his residence and had lived in that residence for approximately six years. After being uncuffed, the Defendant was free to move around and accompanied SA Cramsey to a bedroom in the residence. When the Defendant wanted to smoke, SA Cramsey obtained his cigarettes. SA Cramsey testified that for the officers' safety he had an officer obtain the cigarettes from the Defendant's room. SA Cramsey, SA Camargo and the Defendant went outside so that the Defendant could smoke. SA Cramsey asked the Defendant if he wanted to make coffee, but the Defendant declined. Courts have found that a neutral and familiar setting is a significant factor weighing against a court finding a custodial interrogation. *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006), *United States v. Gomes*, 279 Fed. App'x 861, 868 (11th Cir. 2008).

The Defendant was very familiar with the surroundings and moved from inside to outside freely. The officers did accompany the Defendant throughout the house and then outside and did monitor the Defendant while in the bathroom by leaving the door open a crack which weighs in favor of a custodial setting. SA Cramsey testified that he accompanied the Defendant for the safety of the officers and the Defendant's safety, although the Defendant was free to leave.

Once the Defendant began speaking to SA Cramsey, the Defendant did make incriminating statements. However, an officer's subjective suspicions regarding a suspect only become a factor in a custody determination if the officer conveyed his suspicions to the suspect. *United States v. Gomes*, 279 Fed. App'x. 861 (11th Cir. 2008). In this case, there is no testimony that SA Cramsey voiced any of his suspicions to the Defendant. Further, SA Cramsey never arrested the Defendant, and when the interview was completed, the Defendant agreed to go with another agent for a polygraph test. When the Defendant left the residence, according to SA Cramsey he was not under arrest.

The Court must view the situation from the viewpoint of a reasonable "innocent" person. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). In this case, there were reasonable innocent people at the scene during the time of the Defendant's interview. Two couples who were not believed to be involved in any illegal activity were there, and were free to go, as evidenced by the fact that they did leave. Stephanie Almasi and David Jackson testified that they knew that they were not under arrest, and did leave while the officers conducted the search of the residence. Mrs. Saylor also left while the search was being conducted to take her child to preschool. Therefore, these individuals clearly were free to leave and did leave.

The Court must consider all of the facts and weigh the evidence presented. *United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006). No one fact is determinative of the issue of whether the interview was custodial or not. *Id*. The factors weighing in favor of a non-custodial interview are that the Defendant was told by SA Cramsey that he was free to leave, was not under arrest, could stop answering questions at any time, and could refuse to answer any specific question; the interview occurred in familiar surroundings; the Defendant was uncuffed shortly after the officers entered the residence; the Defendant was free to go outside and smoke a cigarette; after the interview concluded, the Defendant left the residence with another agent; and other people left the residence while the search was occurring. The only factor that weighs against the non-custodial nature of the interview was that the Defendant was not permitted to retrieve his own cigarettes, and was required to leave the door of the bathroom open a crack. These two factors are not sufficient to rise to the level of "extensive" restraint, such that a reasonable person would have felt he or she was **not** free leave. *See, Brown*, 441 F.3d at 1349. SA Cramsey testified that both the obtaining the cigarettes and the open bathroom door were for the safety of the officers and the Defendant. These two incidents do not

outweigh SA Cramsey telling the Defendant he was not under arrest, was free to go, was free to stop answering questions, and was free to move around the residence as long as he did not interfere with the search. The Defendant never availed himself of the simplest method of ending the interview, by stopping talking to the agents. *See*, *Brown*, 441 F.3d at 1349. Further, reasonable people actually left the residence while the search was being conducted. Therefore, the Court determines that the interview that occurred at the residence was non-custodial, and the statements made by the Defendant should not be suppressed.

**IT IS RESPECTFULLY RECOMMENDED**:

That the Motion to Suppress Statements (Doc. 22) be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this __7th__ day of May, 2012.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record